UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
(at Ashland)

| | | |
|---|---|---|
| CARRIE COX, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 0: 20-120-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| ANTHONY TODD RUCKEL, et al., | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | |

**\*\*\*   \*\*\*   \*\*\*   \*\*\***

Plaintiffs Carrie Cox and Guy Meade planned to create a "park-like atmosphere" on their property next to historic Cabin Creek Covered Bridge in Lewis County, Kentucky. Unfortunately, their plan did not come to fruition. Instead, a battle ensued between the plaintiffs and a faction of the local community who believed the plaintiffs were trying to stop citizens from visiting the bridge. Caught between the plaintiffs (who believed individuals were trespassing on their property) and constituents (who wanted access to the bridge), County Judge Executive Todd Ruckel obtained an easement from an adjoining property owner to provide visitors access to the bridge. Cox and Meade claim that the easement lies on *their* property and that Ruckel and other public officials' conduct was in retaliation for the plaintiffs' speech at a fiscal court meeting held in October 2019.

The plaintiffs filed this suit in October 2020, alleging that the defendants unlawfully retaliated against them in violation of the First Amendment to the United States Constitution. The defendants have moved for summary judgment and the plaintiffs have filed a cross-motion for summary judgment with respect to their claim for liability against Defendant Ruckel. The

defendants' motion will be granted because they are entitled to qualified immunity. The plaintiffs' motion will be denied.

## I.      Background

Cox and Meade purchased property in Lewis County, Kentucky in May 2017. [Record No. 53-32]  The property is located beside the Cabin Creek Covered Bridge, which draws frequent visitors to the area. The Commonwealth of Kentucky owns the bridge. It is managed by the Transportation Cabinet, the Department of Parks, the Kentucky Heritage Counsel, and the Buffalo Trace Covered Wooden Bridge Authority, with the assistance of the Buffalo Trace Area Development District. K.R.S. § 176.400. [*See also* K.R.S. § 176.410; Record No. 64, pp. 6-7.]

Cox and Meade purchased the property from Dennis Humphries who had abandoned it several years earlier. [Record No. 67, p. 18]  As a result of the property being uninhabited, local citizens often used Humphries' property to access the bridge. They would also swim and fish in Cabin Creek, a part of which ran through Humphries' property. Prior to purchasing the property, Cox and Meade did not speak with anyone about what property Humphries actually owned and they did not inspect the property. They were provided, however, a property valuation administrator ("PVA") map upon closing. It was Cox's understanding that her property boundaries matched those indicated on the PVA map. *Id.* at 20.

A small gravel patch located in front of the entrance to the bridge on its eastern side and owned by the state was utilized by visitors for parking. [Record No. 67, p. 31]  Additionally, visitors could access a grassy section of land beside the gravel patch for parking, picnicking, and other activities. Cox contends that, for a time, she gave the county permission to mow this section of land in exchange for visitor use.

Cox and Meade engaged in an "expensive, thorough, and loving restoration" of the property, which included restoring a house that had previously fallen into disrepair. A county roadway on the western side of the bridge served as an entrance and exit for the bridge and ran "within feet of the front door" of Cox and Meade's home. [Record No. 53-14] Lewis County had granted an easement to the state in 2012 to allow the roadway's use for visitor access to the bridge. However, the easement provided that the state's lack of use for a period of two consecutive years would be deemed abandonment, resulting in its termination.

In March 2018, Lewis County Attorney Ben Harrison advised state officials that the road had not been used or maintained for a number of years. He further indicated that the road was not sufficiently wide for a vehicle to turn around without using Cox and Meade's property. The county's position at that time was that the state's easement had terminated and the road should revert to Cox and Meade. [Record No. 53-14] Harrison also stated that Lewis County was willing to "acquire property from a private landowner on the eastern portion of the bridge for the purposes of vehicle parking for visitors to the bridge." *Id.* at 2.

The plaintiffs contend that trespassers were a problem from the beginning. While Cox understood that the bridge "was there for people's enjoyment during the daylight hours," she grew increasingly concerned about trespassing and criminal activity. Members of community became upset at Cox's perceived interference with their use of the bridge and surrounding land. And some appeared to believe that, because they previously had unfettered access to the property, they should continue to be permitted to use the land as they pleased.

Cox's critics created and/or participated in a Facebook page called "Troll of Cabin Creek Covered Bridge," which accused Cox of asserting ownership of the bridge and damaging it by removing graffiti. They further complained that Cox did not have the right to

stop citizens from entering Cabin Creek.  Cox and Meade called the Lewis County Sheriff's Office at least 50 times during the relevant period to report trespassing.  Their claims were substantiated on various occasions but often the alleged trespassers could not be found, as it took deputies as much as a half an hour to reach the residence due to its remoteness.  At least two individuals faced harassment charges due to their conduct.  [Record No. 55, p. 69]

Amy Kennedy, Executive Director of the Buffalo Trace Area Development District, became involved after Covered Wooden Bridge Authority member Lori Ulrich advised her that Cox had installed a gate at the end of the bridge closest to her house.  [Record No. 64, p. 18]  Kennedy also received complaints that Cox was "running people out of the bridge after dark." [Record No. 53-16]  As of March 2018, the state "wanted the road open for public access to both sides of the bridge."  [Record No. 64, p. 24]  And it began to consider taking legal action against Cox in September 2018.  [Record No. 53-18; 53-26]

Around October 4, 2019, the county installed a pole light and camera adjacent to the bridge in an effort to alleviate criminal activity.  *Id.* at 55.  According to Cox, people began to gather in protest of the light and camera which they believed she had installed.  *Id.* at 57.  Chatter in the Facebook group escalated, as citizens accused Cox of "spying" on those who came to the bridge.

Cox resolved to address the issues at a meeting of the Lewis County Fiscal County on October 14, 2019.  She told Lewis County Judge Executive Todd Ruckel in advance that she wished to speak at the meeting.  However, Ruckel advised Cox against the idea, as he believed it was an issue for law enforcement rather the fiscal court.  [Record No. 54, p. 57]  Regardless, both Cox and Meade attended and spoke at the meeting with several of their adversaries present.  Cox stated, in relevant part:

We have already taken a lot of the county's time and resources for this issue. There's a narrative out there that we've run people off from the Cabin Creek Covered Bridge—that is not true; we've asked people not to be on our private property, which is different from where the bridge is. And I think you've already visited people and told them that we own to the road that they can visit the 114 foot structure that's there but this is not and that we are entitled to our privacy. I believe you already clarified that the camera belongs to the county and the county are the only people who have access to the camera. Despite the narrative out there that it's our camera and we're spying on people. There's no expectation of privacy in a public place. However we have an expectation of privacy in our home. . . .

The narrative attempt has been about to make this about the bridge. The reality is that this about our home. We meet lots of amazing people who come to the bridge…. We opened our home at night to a photographer so he could get the kind of shot he wanted. We've given countless tours of our home. All we're asking is that our privacy and our private property be respected and that the town would support us in doing that. It's getting to the point that a woman was shot at, our cat was shot and killed, our dog was shot at, and my kids are afraid to be in their own home and that isn't appropriate. I contacted the state and they said people cannot gather at the bridge with the intent to harass us, to loiter. The expectation is that they will visit and they will go.

There have been three gatherings at our home. Two on September 30 and one on October 5 with the intent to harass us. The state has assured me that if that continues they will close the bridge to the public completely. That's not what we wanted. We wanted to make it a parklike atmosphere. Just because I live next to a historic landmark doesn't mean I have an expectation of criminal behavior. We're hoping we have the county's support in that. We do appreciate you putting up the light and camera and the other security measures you've taken and Sheriff, thank you for making your men available to us when we need them. And Ben, thanks for what you've done in terms of starting to prosecute people.[1]

Cox had a professional film crew on site to record the meeting. [Record No. 67, pp. 67-68]

She provided information packets and contends that Sheriff Johnny Bivens handed out copies of the PVA map of her property. [*See* Record Nos. 56, p. 15.]

---

[1]      This excerpt is derived from the defendants' conventional filing containing a video of the October 14, 2019, Lewis County Fiscal Court meeting. [Record No. 52]

Following the meeting, Ruckel began gathering information in an effort to resolve the conflict. He recalled that Cox's neighbor, Melvin "Porty" Hughes, had granted the county an easement on his property which abutted Cox's property next to the bridge. [Record No. 54, p. 14] This was the same portion of property that Cox previously "allowed" the county to mow in exchange for visitor parking. Ruckel did not recall having an agreement with Cox and stated that the area was already being mowed by county employees when he was elected Judge Executive. [*See* Record Nos. 54, pp. 14-15; 53-19.]

Ruckel was unable to locate a signed agreement from Hughes granting the county an easement. However, a 2007 survey performed by county surveyor Mike Ruggles indicated that the property subject to the purported easement belonged to Hughes. Ruckel asked Harrison to draft an easement "for the purpose of establishing a parking and viewing area" for Cabin Creek Bridge. [Record No. 51-12] Ruckel and his friend Shane Wallingford, along with a notary public, drove to Hughes' home on October 18, 2019, and Hughes executed the easement. [Record No. 62, pp. 63-64]

On October 21, 2019, Ruckel sent Cox a text message, advising that his entire week following the fiscal court meeting had been spent dealing with the covered bridge issue. He further stated that he had located a 2007 survey of the property and that the county possessed an easement on Hughes' property (although he did not specify that it was recently obtained). [Record No. 54, p. 67] Ruckel further indicated that he had given all of the information to the Lewis County Herald and that an article would be forthcoming that week. Cox contends that Ruckel told her in a telephone conversation that "he controlled everything that went into the newspaper" and that if she challenged anything in the article, "he would open the road in front of [her] house." [Record No. 67, p. 73-74]

As expected, an article was published in the local newspaper stating that the covered bridge boundaries had been clarified based on the survey. Ruckel described the easement granted by Hughes, explaining: "This is the parking area and where people can access the creek." [Record No. 51-15] Ruckel also indicated: "I want everyone to be able to enjoy the bridge and the area around it, and I want the property owners to have their privacy." *Id.* Cox reports that her opponents soon began thanking Ruckel on social media for "supporting them." [Record No. 67, p. 72]

Cox contends that the Ruggles survey was inaccurate and that Ruckel and Harrison knew of the inaccuracy prior to October 14, 2019. *Id.* at 38. According to Cox, the state had Howerton Engineering and Surveying perform a survey prior to this date "for the purposes of returning the road in front of [Cox's] house" so that she and Meade "would have a clear title." [*Id.* at 39; Record No. 53-12] According to Cox, Jean Baird, an attorney from the state, told Cox that Howerton had "uncovered problems" with the Ruggles survey. Cox further alleged that "both [Ruckel] and [Harrison] were aware of that conversation." But Ruckel and Harrison denied having any recollection of such conversation or having had any other reason to believe Ruggles' survey was flawed. [Record Nos. 54, pp. 27, 36; 55, pp. 22, 42]

Cox and Meade commissioned their own survey by Cahill Surveyors in 2020. *Id.* at 42. Cox contends that the Cahill survey matches the PVA map, which indicates that she and Meade own the disputed easement.

Lewis County Fiscal Court filed a petition to quiet title with respect to the easement and the county road on August 24, 2020. The Fiscal Court named as defendants: Cox, Meade, Hughes, and the Kentucky Tourism, Arts, and Heritage Cabinet. (Lewis County Circuit Court

No. 20-CI-127)  [Record No. 53-48]  And that matter remains pending in state court.  Cox and Meade filed the present action on October 2, 2020.

## II.    Standard of Review

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  In other words, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The moving party has the initial burden to show that there is no genuine issue of material fact, but if that burden is satisfied, the nonmoving party must demonstrate that there is sufficient evidence from which the jury could render a verdict in its favor.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

"The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.  In reviewing a motion for summary judgment, the Court must view all facts and draw all reasonable inferences in a light most favorable to the nonmoving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).  The fact that both the plaintiffs and defendants have moved for summary judgment does not change the analysis.  The Court evaluates each motion on its own merits, drawing all reasonable inferences against the parties whose motion is under consideration.  *See Taft Broadcasting Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991).  However, when a defense of qualified immunity is asserted, the analysis is somewhat altered.  Specifically, the existence of a disputed, material fact does not preclude summary judgment if the defendants

cannot be shown to have violated clearly-established law.  *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *Dickerson v. McClellan*, 101 F.3d 1151, 1158 (6th Cir. 1996).

### III.    Analysis

To prevail under 42 U.S.C. § 1983, the plaintiffs must prove that the defendants were acting under the color of state law and that they were deprived of a right secured by federal law.  Cox and Meade allege that Defendants Ruckel, Terri Thomas, and Amy Kennedy retaliated against them for speaking at the October 14, 2019 fiscal court meeting, in violation of the First Amendment to the United States Constitution.  It is undisputed that the defendants were acting under color of state law during the events alleged.

To succeed on their First Amendment retaliation claim, the plaintiffs must show that they were engaged in a constitutionally protected activity; that a defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and that the adverse action was motivated, at least in part, as a response to the exercise of the plaintiff's constitutional rights.  *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977); *Adair v. Charter Cnty. of Wayne*, 452 F.3d 482 (6th Cir. 2006).

### A.    Qualified Immunity

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  This doctrine protects "all but the plainly incompetent or those who knowingly violate the law."  *Humphrey v. Mabry*, 482 F.3d 840, 847 (6th Cir. 2007) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  The ultimate inquiry is whether

a reasonable official could have believed the challenged action to be lawful in light of clearly established law and the information he or she possessed. *MacIntosh v. Clous*, 69 F.4th 309, 315 (6th Cir. 2023) (cleaned up).

The qualified-immunity analysis involves a two-pronged inquiry. First, do the facts taken in the light most favorable to the plaintiff show that the defendants' conduct violated a constitutional right? *Id.* (quoting *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015)). Second, was the right "clearly established such that a reasonable official would understand that what he is doing violates that right[?]" *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). The Court may consider these questions in either order. *Godawa v. Byrd*, 798 F.3d 457, 462-63 (6th Cir. 2015).

Once the defense of qualified immunity has been asserted, the plaintiffs bear the burden of demonstrating that the defendant is not entitled to assert it. *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016). Qualified immunity will shield a defendant from civil damages if either prong is not satisfied. *Gordon v. Bierenga*, 20 F.4th 1077, 1082 (6th Cir. 2021). And if more than one defendant is involved, the Court must consider each defendant's entitlement to immunity separately. *Smith v. City of Troy*, 874 F.3d 938, 944 (6th Cir. 2017).

### 1.      Defendant Ruckel

Cox alleges that her protected speech at the October 14, 2019 fiscal court meeting angered Ruckel, causing him to retaliate by committing the following adverse actions: obtaining the purported easement from Hughes, giving information about the easement to a local newspaper for inclusion in an article, and threatening to assert ownership of the road in front of Cox's home and open it to the public.

- 10 -

To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. *District of Columbia v. Wesby*, 138 S. Ct. 577, 589-90 (2018); *Garvie v. Jackson*, 845 F.2d 647, 649 (6th Cir. 1988) ("We should focus on whether, at the time the defendants acted, the rights asserted were clearly established by decisions of the Supreme Court or the courts of this federal circuit."). It is not necessary for there to be a case directly on point, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). The salient question in making this determination is whether the official had fair warning that his or her conduct was unlawful. *Guertin v. Michigan*, 912 F.3d 907, 916 (6th Cir. 2019) (quoting *Harlow*, 457 U.S. at 805).

There are few cases from this circuit addressing First Amendment retaliation claims brought by plaintiffs who are neither public employees nor prisoners. *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 724 (6th Cir. 2010). While a private citizen need not allege as great a harm as a public official or prisoner, the relevant inquiry remains whether the defendant's adverse action would deter a person of ordinary firmness from engaging in protected conduct. *Id.* (citing *Mezivob v. Allen*, 411 F.3d 712, 717 (6th Cir. 2005).

The plaintiffs cite myriad cases in response to the defendants' motion for summary judgment, arguing that it is clearly established that public officials cannot retaliate against citizens for engaging in public speech. They suggest that because Cox and Meade engaged in public speech and subsequently faced negative experiences involving the defendants, the Court's analysis should go no further. [*See* Record No. 69, pp. 11-12 ("[s]ome circuit cases reflect that the qualified immunity inquiry extends only to the protected conduct/speech prong").] However, the plaintiffs' request for a truncated analysis is undermined by the Sixth Circuit's recent decision in *MacIntosh v. Clous*, 69 F. 4th 309 (6th Cir. 2023).

- 11 -

*MacIntosh* involved a meeting of the Grand Traverse County Commission, which was conducted over Zoom.  After MacIntosh criticized the Commission's actions and asked it to denounce "the Proud Boys and similar violent groups,"  Defendant Commissioner Clous briefly left the frame and returned with a firearm, which he displayed to the camera.  MacIntosh alleged that Clous' action made her fearful and deterred her from speaking at subsequent government meetings.  McIntosh sued Clous and the county, asserting a First Amendment retaliation claim.  The district court denied Clous' assertion of qualified immunity, which he appealed to the Sixth Circuit.  *Id.* at 314-15.

 Rather than adopting an abbreviated analysis of the claim as the plaintiffs propose here, the court considered whether the defendants' alleged actions were sufficiently similar to those in previous cases.  It found that the facts of *McIntosh* were sufficiently analogous to those of *Zilich v. Longo*, in which the court held that city officials acted adversely when they threatened to physically harm a plaintiff during a meeting. 34 F.3d 359, 365 (6th Cir. 1994).  It noted that Clous also was on notice that his conduct violated the plaintiff's First Amendment rights based on *Thaddeus-X*, which concluded that physical threats constitute adverse action.  The court concluded that, even if Clous' conduct presented novel factual circumstances, he still had fair warning that his actions were prohibited and "[n]o reasonable official could believe that it was permissible to brandish a deadly weapon in response to [the plaintiff's] public comment asking the official to condemn violence." *Id.* at 321.

Here, the plaintiffs' additional attempts to demonstrate that Ruckels' actions were clearly unlawful are unavailing.  Cox and Meade rely on the Sixth Circuit's decision in *Benison v. Ross*, 765 F.3d 649 (6th Cir. 2014), to advance the general proposition that "[f]iling a lawsuit against someone is sufficient adverse action."  [Record No. 69, p. 19]  But that decision did

not announce such a broad rule.  The case involved a university professor whose husband, a student at the university, sponsored a vote of no confidence in the university's president and provost.  The Sixth Circuit concluded that a reasonable individual might be dissuaded from engaging in protected conduct based on the university's threat of a lawsuit holding the professor liable for more than $50,000 compensation she had previously received while on sabbatical.  *Id.* at 660.  *Benison* is starkly dissimilar from the instant matter and would not have placed the defendants on notice they their actions violated the plaintiffs' clearly-established constitutional rights.

The plaintiffs also rely on the unpublished opinion in *Fakhoury v. O'Reilly*, 837 F. App'x 333 (6th Cir. 2020), in seeking to establish that "interference or restriction of property rights in land is sufficient adverse action for a First Amendment retaliation case."  [Record No. 69, p. 16]  But they cannot rely on unpublished decisions to satisfy this burden.  *Bell v. City of Southfield, Mich.*, 37 F.4th 362, 368 (6th Cir. 2022).  Regardless, *Fakhoury* involved a real estate developer's retaliation suit against city officials, who the developer claimed had subjected him to police harassment, selective prosecution, and unwarranted citations for violating building codes.  There is nothing to suggest that a reasonable official in the defendant's shoes would have understood that he was violating the plaintiffs' clearly-established constitutional rights under the facts of *Fakhoury*.

Finally, the plaintiffs rely on the decision in *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718 (6th Cir. 2010), in which Fritz, an independent insurance agent, alleged that the defendants retaliated against her for attending Comstock Planning Commission and Board of Trustees meetings related to the approval of her home office.  Fritz alleged that the defendants retaliated against her by denying her a zoning variance, issuing her a signage violation, and

eventually complaining to her supervisors, which allegedly led to her termination by the insurance agency.

In determining that the defendants' conduct was sufficient to constitute an adverse action for purposes of First Amendment retaliation, the Sixth Circuit noted that the defendants had spoken with Fritz's "private employer about [her] protected conduct in such a way as to either defame [her] or to threaten her economic livelihood directly or indirectly." *Id.* at 724. Likewise, it observed, the denial of Fritz's requests for zoning and signage variances directly impacted her ability to conduct business in the manner of her choosing, which threatened her economic livelihood. *Id.* at 728. The present case is clearly distinguishable, as the plaintiffs have not alleged that the defendants' actions impacted their economic livelihood.

In summary, the plaintiffs have not identified (and the Court has not located) any authority indicating that Ruckel violated the defendants' clearly-established constitutional rights. Even if Ruckel was angry as a result of the plaintiffs speaking against his advice as they claim, he simply obtained an easement from an individual who owned the land according to the only known survey at the time. He then provided truthful information to a newspaper concerning the easement, which was intended for public access to a historic site. And even construing the plaintiffs' version of the facts as true, Ruckel threat to take control of a road the county already owned so that citizens could access a public attraction does not alter this analysis. A reasonable official in Defendant Ruckel's position easily could have believed these actions to be lawful. Accordingly, he is entitled to qualified immunity.

### 2.    Defendant Thomas

The plaintiffs also make a vague allegation that Lewis County Magistrate Terri Thomas "was involved in a conspiracy to retaliate" and "published various statements in support of

Ruckel," which harassed and threatened the plaintiffs.  Cox testified during her deposition that Thomas stated in an unidentified fiscal court meeting that Cox "was the reason that there was no money for the ambulance service" and that Cox was "coming across the bridge and that was what was causing the problems."  *Id.* at 95.  But the plaintiffs have failed to identify any authority suggesting that Thomas violated a clearly established right of which a reasonable person would have known.

While the Sixth Circuit has recognized injury under § 1983 based on embarrassment, humiliation, and emotional distress, "it has done so only in rare instances where defendants reveal false, irrelevant or extremely intimate and humiliating details about a plaintiff."  *Ball v. City of Detroit*, 2022 WL 17994012, at *13 (Dec. 29, 2022) (citing *Bloch v. Ribar*, 156 F.3d 673, 679-80 (6th Cir. 1998); *Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 585 (6th Cir. 2012)).  Likewise, adverse actions sufficient to satisfy this requirement may include "harassment or publicizing facts damaging to a person's reputation."  *Fritz*, 592 F.3d at 724 (citing *Thaddeus-X*, 175 F.3d at 396.  In short, Thomas' relatively innocuous statements do not rise to the level of a constitutional violation.

The lack of evidence suggesting that the alleged retaliatory acts were motivated, even in part, by the defendants' public speech is also fatal to the plaintiffs' claims against Thomas.  Thomas was not present at the October 14 fiscal court meeting and the plaintiffs have not pointed to any evidence tying his conduct to their statements made during the meeting.  [Record No. 67, p. 69]  Instead, Cox merely speculates that she *thought* Thomas was retaliating against the plaintiffs for speaking at the meeting and she *believes* that Thomas "didn't show up to that fiscal court meeting intentionally because she didn't want to hear what [the plaintiffs] had to say."  *Id.* at 109.  Thus, Thomas also is entitled to qualified immunity.

- 15 -

### 3.     Defendant Kennedy

The plaintiffs' allegations regarding Defendant Kennedy are scant.  They contend that she sent emails to the Kentucky Tourism, Arts, and Heritage Cabinet "in an effort to cajole" the Cabinet into seizing the road in front of the plaintiffs' house.  Cox also testified that Kennedy was "carrying the harassers' narrative both to the media and to the state's attorneys." *Id.* at 114.  With respect to the first assertion, it appears that Kennedy was simply doing her job.  The state had obtained an easement over the road in 2012 so that it could be used for visitor access to the bridge.  As an ambassador for the bridge (and the state), it is not surprising that Kennedy would seek to maintain a route for visitor access, particularly when the primary alternate access area appeared to be in jeopardy.  And Cox conceded in her deposition that Kennedy was attempting to secure the road for the state prior to the October 14, 2019 fiscal court meeting, which Kennedy did not attend.

Cox also testified that Kennedy arranged for contractors to work on the bridge, who then harassed Cox and sprayed her with chemicals.  *Id.* at 116.  She believes that Kennedy told the contractors in advance that Cox was "going to be a problem for them" because Kentucky State Police officers were on standby.  This allegation is insufficient to form the basis of a First Amendment retaliation claim.  While the Sixth Circuit has recognized that physical harm or threats of physical harm may be sufficient to deter a reasonable person from engaging in protected conduct, there is no evidence that Defendant Kennedy engaged in, knew about, or was in any way responsible for the contractors' alleged conduct.  Further, Kennedy did not attend the October 19, 2019 fiscal court meeting and, as with Defendant Thomas, the plaintiffs have not tied the actions attributed to her to the plaintiffs' protected speech.  Like the other defendants, she is entitled to qualified immunity.

### B.       Conspiracy to Retaliate

The Sixth Circuit has repeatedly held that a failure to establish an underlying constitutional violation will doom a conspiracy claim based on that same right. *Jordan v. Straughter*, 520 F. Supp. 3d 892, 901 (E.D. Mich. 2021) (citing *Bauss v. Plymouth Twp.*, 233 F. App'x 490, 500 (6th Cir. 2007)).  Based on the foregoing analysis, the defendants are entitled to summary judgment with respect to the plaintiffs' conspiracy claims.

### C.       Remaining Issues

#### 1.       Plaintiffs' Improper Attempt to Assert New Theories

Cox raises unpled theories for the first time in her response to the defendants' motion for summary judgment.  More specifically, Cox contends that, in June 2020, she sent the defendants a letter in which she threatened to file the instant lawsuit and that she spoke on a Cincinnati-based television station.  Cox argues that both activities constitute protected speech under the First Amendment and that the defendants retaliated against her by filing the quiet title action in August 2020.

A plaintiff, however, may not expand her claims to assert new theories for the first time in response to a motion for summary judgment.  *Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394 (6th Cir. 2007); *Desparois v. Perrysburg Exempted Vill. Sch. Dist.*, 455 F. App'x 659, 666 (6th Cir. 2012); *see also EEOC v. J.H. Routh Packing Co.*, 246 F.3d 850, 854 (6th Cir. 2001) (noting that even under the liberal notice-pleading system, the Federal Rules of Civil Procedure require "that the complaint give the defendant fair notice of the claim and its supporting facts").  Instead, the proper procedure is to seek amendment of a complaint in accordance with Rule 15. *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d

- 17 -

784, 788 (6th Cir. 2005).  But despite ample opportunity to do so, the plaintiffs did not seek to amend their Complaint and they may not advance a new theory for relief at the eleventh hour.[2]

## 2.    Meade's Declaration

The plaintiffs tendered Plaintiff Meade's declaration as an attachment to their response to the defendants' motion for summary judgment.  Although Meade was previously deposed, his deposition transcript was not filed in the record.  Meade's declaration states that after he and Cox spoke for the first time at the October 19, 2019 fiscal court meeting, the audiovisual recording was stopped.  However, the issue of the bridge came up again later and Cox made additional comments, which were not recorded.  According to Meade, Cox stated that she and Meade "owned the land" and that she "publicly objected to any additional expenditure of public funds being used to mow or maintain that space."  [Record No. 69-1, p. 2] The defendants seek to strike the declaration as a sham affidavit.  [Record No. 70, p. 2]

The defendants have tendered an excerpt from Meade's deposition in which he was asked whether he addressed "any of the concerns about public money being used for on [sic] private property."  *Id.* at 3.  Meade, who had sustained a traumatic brain injury, responded that it was "too recent after [his] wreck to have details like that."  When asked whether he spoke after Cox (as evidenced in the video), Meade simply said yes, and did not mention any subsequent statements made by Cox.  *Id.*

The sham affidavit doctrine provides that a party may not file an affidavit that contradicts earlier testimony after a motion for summary judgment has been made.  *France v.*

---

[2]    The Court has no reason to believe that these purported new theories would alter the outcome of this decision, as the plaintiffs have not identified any authority demonstrating that the plaintiffs' alleged actions in these incidents constitute a violation of clearly established law.

*Lucas*, 836 F.3d 612, 622 (6th Cir. 2016).  When, as here, the affidavit does not directly contradict prior sworn testimony, it should be stricken if it is "an attempt to create a sham fact issue."  *Id.*  The rationale behind the doctrine is that "[i]f a party who has been examined at length [under oath] could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."  *Id.* (quoting *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969)).

When determining whether such an affidavit is an attempt to create a sham fact issue, courts consider whether the affiant was cross-examined during earlier testimony, whether the affiant has access to pertinent evidence at the time of the earlier testimony, and whether the earlier testimony reflects confusion that the affiant later attempts to explain.  *McClain v. Mason Cnty., Ky.*, 2015 WL 3824957, at *4 (6th Cir. 2015) (citing *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 907 (6th Cir. 2006)).  In this case, it does not appear that Meade was cross-examined during his deposition.  However, he clearly would have had access to the pertinent evidence at the time of his earlier testimony.  It is telling that Cox, who allegedly made the statement, was unable to remember whether she commented on the county's alleged misuse of funds at the October 19 meeting during her own deposition, while Meade, who had sustained a traumatic brain injury and conceded having memory problems, recalled that she did so.  The Court also notes that the plaintiffs provided a detailed description of the fiscal court meeting in an answer to interrogatories, and did not mention the misuse of public funds. [*See* Record No. 74, p. 2.]

- 19 -

Based on the foregoing, the undersigned concludes that Meade's declaration constitutes a sham affidavit.  Therefore, it will not be considered part of the record in evaluating the parties' competing motions for summary judgment.

### 3.     Spoliation of Evidence

The plaintiffs' counsel sent the defendants a letter on June 25, 2020, asking that they preserve "all evidence, including memoranda and notes" related to this matter.  [*See* Record No. 55, p. 52.]  Harrison, who also had a Lewis County email account, explained that his email was "automatically backed up through the state servers."  However, it does not appear that any measures were taken to preserve Ruckel's email account after he left office on November 30, 2020.  [Record No. 54, p. 106]  Ruckel explained during his deposition that his official email account was administered "through the county" and that whatever happened to it was "up to them."  *Id.* at 83.  The plaintiffs contend that Ruckel spoliated evidence by failing to preserve his Lewis County email account.  [Record No. 69, pp. 10-11]

"The duty to preserve potentially relevant evidence is an affirmative obligation that a party may not shirk."  *Brown v. Tellermate Holdings Ltd.*, 2014 WL 2987051, at *20 (S.D. Ohio July 1, 2014) (quoting *Mosaid Tech., Inc. v. Samsung Elec. Co., Ltd.*, 348 F. Supp. 2d 332, 339 (D.N.J. 2004)).  Rule 37(e) of the Federal Rules of Civil Procedure addresses the failure to preserve electronically stored information such as email.  It provides:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
>> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

(2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

       (A) presume that the lost information was unfavorable to the party;

       (B) instruct the jury that it may or must presume the information was unfavorable to the party; or

       (C) dismiss the action or enter a default judgment.

Consistent with Rule 37, the Court must consider what the missing evidence may have revealed. *See Kronisch v. United States*, 150 F.3d 112, 127 (2d Cir. 1998). Here, the plaintiffs concede that Ruckel's conduct in failing to preserve the emails may constitute negligence and do not provide any input on what information the missing emails might contain or how they it could impact the case. Additionally, the plaintiffs do not seek a specific form of relief—they simply state that an adverse inference instruction and denial of the defendants' motion for summary judgment are two possible remedies.

The goal of any spoliation remedy is to place the innocent parties in the place they would have been in had the evidence not been destroyed. *Id.* Based on the defendants' entitlement to qualified immunity due to a lack of clearly-established law prohibiting their alleged conduct, the Court cannot envision how the content of the missing emails would change that result. This is particularly the case in light of the fact that many of the relevant communications were accomplished *via* telephone and text messages, which were produced in discovery. Although Ruckel may have acted improperly by failing to preserve the email account, any remedial action would result in an unwarranted windfall to the plaintiffs.

## IV.   Conclusion

Based on the foregoing, it is hereby

**ORDERED** as follows:

1.      Defendants Anthony Todd Ruckel, Terri Thomas, and Amy Kennedy's motion for summary judgment [Record No. 51] is **GRANTED**.

2.      Plaintiffs Carrie Cox and Guy Meade's motion for partial summary judgment [Record No. 57] is **DENIED**.

Dated:  July 10, 2023.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky

- 22 -